Joseph J. Imhoff and Edith M. Imhoff v. Commissioner.
Imhoff v. Commissioner
Docket No. 2633-68.
United States Tax Court
T.C. Memo 1970-221; 1970 Tax Ct. Memo LEXIS 141; 29 T.C.M. (CCH) 966; T.C.M. (RIA) 70221; July 29, 1970. Filed James J. Cloran, 1100 Philadelphia Nat'l Bank Bldg., Philadelphia,Pa., for the petitioners. Max J. Hamburger, for the respondent. *142 QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: The respondent determined deficiencies in petitioners' income taxes and additions with respect to those deficiencies pursuant to section 6653(a) [1] as follows: Taxable Year
Deficiency
Additions Pursuantto Sec. 6653(a)
1961
$5,479
$274
1962
$3,687
$184
1963
$4,848
$242
Certain issues have been resolved by agreement of the parties. There remains for decision the questions of (1) the extent to which the petitioners used their residence in connection with their income-producing activities; and (2) whether any underpayment of tax in the years in issue was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). Findings of Fact Some of the facts have been stipulated. The stipulations and exhibits thereto are incorporated herein by this reference. The petitioners, Joseph J. and Edith M. Imhoff, are husband and wife. At the time of the filing of their petition, the petitioners were residents of Merion Station, 967 Pennsylvania. For the *143 taxable years here in question, the petitioners jointly filed their income tax returns on a calendar year basis with the district director of internal revenue, Philadelphia, Pennsylvania. Use of Residence Joseph J. Imhoff was retired from the United States Army in January 1957 with the rank of Colonel. During the years in issue, Colonel Imhoff devoted approximately 50 hours a week to the supervision and management of his and his wife's stock holdings. Although the extent of these holdings was not fully set forth, the petitioners' income tax returns show that they held the following number of dividendpaying stocks in the years in issue. TaxableYear
Number of StocksHold
1961
68
1962
73
1963
85
In addition, the petitioners held an unidentified number of nondividend-paying stocks. The petitioners' returns also show the following information regarding stocks sold in the years in issue: Taxable Year
Number of StocksSold
ProceedsReceived
Average Holding Periodin Years
1961
19
$100,254
6
1962
14
59,936
3.3
1963
17
56,422
4.7
Colonel Imhoff initiated approximately the same number of stock purchases as stock sales and *144 thus the petitioners' annual stock transactions in the years 1961 through 1963 were 38, 28 and 34, respectively. In order to obtain the information necessary for the supervision and management of petitioners' stock holdings, Colonel Imhoff subscribed to the following investment publications: The Wall Street Transcript; The Wall Street Journal; Barrons; Value Line; RHM Service; and Standard and Poor's Foreign Securities Service. Colonel Imhoff acted as the administrator of his deceased sister's estate. The petitioners' tax returns for the years 1961 through 1963 show no income from this activity. Mrs. Imhoff was the owner of seven parcels of real estate located in Washington, D.C. and Arlington, Virginia. Six of these parcels were improved with commercial structures. The remaining parcel was used as a parking lot. These properties produced the following amounts of gross rental income: Taxable Year
Gross RentalIncome
1961
$41,098
1962
43,349
1963
42,972
During the years in issue, and for many years prior thereto, the properties were managed by H. G. Smithy Co., a realtor located in Washington, D.C.H.G. Smithy's management consisted of collecting rents, *145 making repairs after consultation with Mrs. Imhoff, receiving tax assessments, paying real estate tax bills, negotiating leases, and inspecting the property. Prior to making major repairs or issuing leases, Mrs. Imhoff's approval was obtained. Every 4 to 6 weeks, Mrs. Imhoff went to Washington to consult with her property manager and to inspect certain of her properties. The H. G. Smithy Co. received fees for their services during 1961 through 1963 in the amounts of $2,054.91, $2,151.00 and $2,180.00, respectively. Colonel Imhoff assisted his wife in reaching decisions required in connection with the repair and leasing of her property. Mrs. Imhoff devoted 7 hours a week to the management of her property. Colonel Imhoff devoted not more than 5 hours a week to assisting his wife in the management of her property. Three years prior to the first of the years in issue, that is in 1958, the petitioners purchased a 21 room residence located in Merion Station, Pennsylvania. On the lowest level, which was below ground level, the residence contained a laundry and heater room. In addition, there was a room that the petitioners have identified at various stages of their dispute with the *146 respondent as a "game room," "recreation room," and "office." That room contained a desk, tables, bookcases, filing cabinets and a typewriter. The room was used in part to store financial records and files that related to the estate of Colonel Imhoff's deceased sister. Colonel Imhoff used this room as a place to perform the duties required as the administrator of his sister's estate. Colonel Imhoff testified that Mrs. Imhoff also used this room at certain unspecified times "as an overflow area to do work that she doesn't do in her office on the first floor." On the first floor of the residence was a room that has been identified by the petitioners as a "library" and "office." This room contained tables, chairs, a telephone, bookcases that contained financial 968 publications, technical books and books relating to investment in foreign countries. Colonel Imhoff referred to his technical books from time to time for background information needed to make investment decisions. Colonel Imhoff used this room primarily as a place to read investment publications such as The Wall Street Journal and The Wall Street Transcript. Across the hall from this room was a room used by Mrs. Imhoff *147 as an office from which she managed her real estate and stock holdings. This room contained a desk in which Mrs. Imhoff kept copies of leases and other records of investments. The leases on Mrs. Imhoff's properties were kept at a bank. A room referred to by the petitioners as a "living room" and "reception room" was used solely for entertaining. A large table in a room referred to by the petitioners as a "dining room" and "conference room" was occasionally used by Colonel Imhoff as a place to spread out work. According to a floor plan submitted by the petitioners, this "dining" or "conference" room was accessible only through the kitchen and pantry. Colonel Imhoff explained that the floor plan had been prepared at "the last minute" and was inaccurate, as there was another entrance to the room. This room was used as a dining room when the petitioners had need for larger facilities than provided by their "regular dining room" which was also referred to as a "breakfast room." On the second floor of the residence was a room that contained a telephone, bookshelves, filing cabinets, tables and a desk. Colonel Imhoff used this room as an office from which he conducted his investment *148 activities. He also used this room in connection with his duties as the administrator of his deceased sister's estate. A number of the rooms in petitioners' residence were used as storerooms. One room contained trunks and old boxes of records going back many years and generally unrelated to any investment activity. Another storeroom contained certain old investment material, old household items, plants and greenhouse material, old income tax returns, military records, electric fans, and other miscellaneous items. A floor plan of the residence submitted by the petitioners listed the square footage of Mrs. Imhoff's office on the first floor as 296 square feet and Colonel Imhoff's office on the second floor as 331 square feet. The plan listed the square footage of the rooms in the residence as 6,780 square feet. However, neither the square footage of the entire residence nor the measurements of the exterior walls from which such a computation could be made were listed. In a schedule attached to the notice of deficiency, the respondent listed the square footage of the rooms of the residence as 15,000 square feet. The method used by the respondent to arrive at this figure was not *149 shown. Taking the floor plan submitted by the petitioners as reflecting the approximate square footage of the rooms, and comparing those measured areas with the unmeasured areas on the floor plan, we find for purposes of this decision that the square footage of the entire residence equaled 9,000 square feet. In petitioners' taxable years 1961 through 1963, they deducted $8,500, $8,250 and $7,500, respectively, as expenses for the production and management of income-producing property. After reviewing the basis of these claimed deductions with the petitioners, the respondent allowed deductions in each of the years of $800 for telephone, $75 for postage, $50 for stationery and $150 for registry. In addition, the respondent allowed deductions for depreciation of the cost of painting three rooms, and the furniture and files contained therein in the total amounts of $765 in 1961 and $815 in 1962 and 1963. These three rooms were identified by the respondent as "Office (wife's)," "Office (J.J.I.)," and "Library." The respondent also determined that the petitioners incurred in 1961 through 1963 expenses in maintaining their residence in the total amounts of $10,975 each year. In addition, *150 the respondent determined the reasonable allowance for depreciation of the residence in these years as $3,470, $3,620 and $3,680, respectively. These expenses of maintenance and depreciation of the residence were characterized by the parties as "indirect expenses." The respondent allowed as deductions for expenses incurred during 1961 through 1963 in connection with the production or collection of income 5.78 percent of these so-called "indirect expenses" of maintenance and depreciation, or $836, $843 and $848, respectively. The respondent's determination was based on his finding that the petitioners devoted 868 square feet of their residence exclusively to the production and management of income. 969 The expenses found by the respondent to be related to the use of the petitioners' residence in connection with the production or collection of income are summarized in the table below: Expenses
1961
1962
1963
Telephone
$ 800
$ 800
$ 800
Painting of, and the furni- ture and files contained in, three rooms
765
815
815
Maintenance and deprecia- tion of 868 square feet of the residence 836
843
848
Total
$2,401
$2,458
$2,463
Section 6653 *151 Additions In their return for 1962, the petitioners reported net long-term capital gains in the amount of $16,439. Due to a mathematical error, the petitioners understated their gain by $1,000. In their return for 1963, the petitioners reported net long-term capital gains in the amount of $9,289. Due to a mathematical error, the petitioners overstated their gain by $664. In their return for 1963, the petitioners listed dividends received from 85 stocks in the total amount of $13,572. Due to an error in addition, the petitioners understated their dividend income by $101. In their 1963 return, the petitioners deducted rental repairs in the amount of $264 in two places; once separately on Schedule B as "Repairs" and once as "Other expenses." In their 1962 return, the petitioners claimed as charitable contributions donations to 41 entities in the amount of $4,825 and miscellaneous donations of $600. The respondent disallowed as a "Non-Qualifying" contribution a donation of $35 and disallowed as "Unsubstantiated Contributions" $288 of claimed donations of $1,125. In their 1963 return, the petitioners claimed as charitable contributions donations to 53 entities in the total amounts *152 of $5,220 and miscellaneous donations of $450. The respondent disallowed as contributions to "organizations, which do not qualify under Section 170" donations to three organizations totaling $60. In their returns for 1961 through 1963, the petitioners claimed itemized deductions in addition to charitable contributions, interest, taxes and medical expenses in the respective amounts of $15,744, $19,141 and $17,622. The respondent disallowed those claimed itemized deductions in the respective amounts of $7,002, $7,118 and $6,113. The respondent's reductions of those claimed itemized deductions were based to a great extent on his determination that the petitioners had overstated the extent to which they used their residence in connection with the production or collection of income. No part of any underpayment of tax was due to the petitioners' negligence or intentional disregard of rules and regulations. Opinion Issue 1. Use of Residence This dispute centers around the extent to which the so-called "indirect expenses" of maintenance and depreciation of the petitioners' residence are deductible expenses. The parties look only to section 212 [2] as the controlling statutory authority *153 for their respective positions. The respondent allowed deductions equal to 5.78 percent of the yearly "indirect expenses" of maintenance [3] and depreciation [4] of the petitioners' residence. The petitioners question the correctness of the respondent's allocation. The requirement of section 212 that deductible *154 expenses be "ordinary and necessary" implies that they must be reasonable in amount and must bear a reasonable and proximate relation to the production of income. Section 1.212-1(d), Income Tax Regs.; Trust of Bingham, 325 U.S. 365 (1945). Recognizing that to be deductible under section 212, the amount of an expense must be reasonable, the petitioners argue that it is reasonable to allocate 50 percent of the yearly maintenance and depreciation costs [5] of their residence to their income-producing activities, as those activities reasonably required the use of 50 percent of 970 the square footage of the rooms of their residence. The petitioners' argument raises questions both as to the method and amount of the allocation of maintenance expenses to their income-producing activities. As to the method of allocation, the petitioners contend that the allocation must be made by comparing the square footage of room space used in the production of income to the total square footage of the rooms that were not used in the maintenance of the residence. Thus, *155 they would ignore the closet and halls, as well as the heater, laundry and other like rooms in allocating such expenses as gas, electricity and insurance between personal and income-producing use. Any allocation of expenses between personal and income-producing use involves a question of fact that must be decided on a case by case basis. However, if an allocation of maintenance expenses is going to be made on the basis of square footage, to be reasonable that allocation must take into consideration the square footage of the entire residence and not just certain rooms of the residence as is suggested by the petitioners. Moving to a consideration of the amount of the respondent's allocation, we note that it was based on allowing the petitioners 868 square feet of space in their residence as being devoted exclusively to the production or collection of income. According to the floor plan submitted by the petitioners, that space was 241 square feet larger than the sum of the square footage of the two rooms that were used by the petitioners as offices from which they conducted their income-producing activities. While the petitioners chose to read materials relating to their investments *156 in their library, to store materials in various rooms, and to spread out their work in their dining and recreation rooms, they failed to demonstrate a reasonable use of space for their income-producing activities in excess of the 868 square feet allowed by the respondent. Accordingly, the respondent's allocation of the "indirect expenses" of maintenance and depreciation of the residence will not be disturbed by this Court except to the extent required by our finding that the square footage of the entire residence equaled 9,000 rather than 15,000 square feet. [6]
Issue 2. Section 6653 Additions In the respondent's view, the petitioners' "studied indifference" as to their record keeping responsibilities [7] resulted in the assertion of the additions to tax pursuant to section 6653(a). [8]
*157 The burden was on the petitioners to prove that the respondent erred in his determination. David Courtney, 28 T.C. 658 (1957). We have found that they satisfied that burden. With minor exceptions, the petitioners' tax returns accurately reported their income. Most of the adjustments made in the years in issue resulted from personal expenses that had been claimed as investment-related expenses and about the character and amount of which there was a bona fide dispute. The respondent requested on brief that we take notice of the Tax Court's file in docket No. 2074-64, a proceeding in which the same taxpayers were petitioners, for the fact that the petitioners had been officially notified that their records were inadequately kept. We must deny that request. Although this Court has the power and duty to take judicial notice of its own acts in an interrelated case involving the same parties (Ambassador Hotel Co. of Los Angeles, 971 32 T.C. 208 (1959)), we will not take judicial notice of matters merely by reason of the fact that they are contained in our files. B. F. Edwards, 39 B.T.A. 735 (1939). Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax. ↩
3. It should be noted that some of these "indirect expenses" of maintenance would not qualify as deductible maintenance expenses under the respondent's own guidelines. See Rev. Rul. 62-180, 1962-2 C.B. 52↩. 4. Neither party relies on sec. 167 nor does the respondent question whether property which is used in connection with investment activities can qualify under sec. 167(a)(2) as "property held for the production of income."↩
5. These costs were determined by the respondent to equal $14,445 in 1961, $14,595 in 1962, and $14,655 in 1963.↩
6. As Mrs. Imhoff's office was used only 7 hours a week in connection with income-producing activities, we find the respondent's allocation especially favorable to the petitioners. See Rev. Rul. 62-180, 1962-2 C.B. 52↩, which indicates the respondent's position to be that a time allocation must also be made in such cases.
7. SEC. 6001. NOTICE OR REGULATIONS REQUIRING RECORDS, STATEMENTS, AND SPECIAL RETURNS. Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary or his delegate may from time to time prescribe. Whenever in the judgment of the Secretary or his delegate it is necessary, he may require any person, by notice served upon such person or by regulations, to make such returns, render such statements, or keep such records, as the Secretary or his delegate deems sufficient to show whether or not such person is liable for tax under this title. ↩
8. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any under-payment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the under-payment.↩